**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JONATHAN R. HOOD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 12 C 10423** |
| ) | |
| **NATIONAL RAILROAD PASSENGER** ) | |
| **CORPORATION,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant National Railroad Passenger Corporation's (Amtrak) motion for summary judgment. For the reasons stated below, the motion is granted in part, the claims brought against Defendant Jesse Nunez (Nunez) under 42 U.S.C. § 1981 (Section 1981) are dismissed, and the remaining state law claims are dismissed without prejudice.

## BACKGROUND

Plaintiff Jonathan R. Hood (Hood) allegedly began working for Amtrak in January 2010 as a mechanic at the Amtrak yard in Chicago (Chicago Yard). Nunez was allegedly another mechanic working at the Chicago Yard. Hood contends that he is "a white Caucasian-American," and that Nunez is "of Hispanic origin and

descent." (A Compl. Par. 1, 3). According to Hood, prior to his being hired, Nunez and other Hispanic mechanics put pressure on Amtrak to hire a Hispanic contractor who was a friend of Nunez. Amtrak allegedly decided instead to hire Hood. Hood claims that he was harassed by Hispanic co-workers at the Chicago Yard who allegedly referred to him by names such as "gringo." Hood also claims that Hispanic co-workers stated that they would try to get him fired. Hood contends that he reported the harassment and that Amtrak did not address the problem. In 2010, Hood's employment was terminated (First Termination) during his probationary period by a Caucasian Superintendent due to his poor attitude at work. Hood allegedly appealed his termination to the Dispute Resolution Office and was reinstated.

Hood contends that he continued to suffer harassment at work. In 2011, Hood was involved in a physical altercation with Nunez (Nunez Altercation), resulting in disciplinary charges against Hood and Nunez. In March 2013, after Hood was again involved in a physical altercation at work, this time with Frank Zeimetz (Zeimetz), a Caucasian co-worker (Zeimetz Altercation), Hood was again charged with disciplinary violations. Hood was also provided with a disciplinary hearing and was found guilty of the charges. In addition, Zeimetz brought criminal charges against Hood, resulting in Hood's arrest. Hood was then terminated for a second time (Second Termination).

Hood includes in his amended complaint a hostile work environment claim brought against Amtrak under Title VII of the Civil Rights Act of 1964 (Title VII),

2

42 U.S.C. § 2000e *et seq*. (Count I), a Title VII race discrimination claim brought against Amtrak (Count II), a Title VII retaliation claim brought against Amtrak (Count III), a Section 1981 race discrimination claim brought against Amtrak (Count IV), a Section 1981 retaliation claim brought against Amtrak (Count V), a Section 1981 discrimination claim brought against Nunez (Count VI), state law intentional infliction of emotional distress claims brought against Amtrak and Nunez (Count VII), state law assault and battery claims brought against Amtrak and Nunez (Count VIII), and a state law tortious interference with employment expectations claim brought against Nunez (Count IX). Amtrak now moves for summary judgment on all claims brought against it. Nunez has not filed a dispositive motion.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A "genuine issue" of material fact in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In

ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

### I.  Objections to Statement of Additional Facts

Amtrak presents various objections to portions of Hood's statement of additional facts. Amtrak contends that Hood has presented too many facts, that certain facts are supported by inadmissible evidence, and that Hood has not properly cited to the record. Although Amtrak is correct that Hood has not complied with Local Rule 56.1, the resulting portions of Hood's statement of additional facts that could be stricken are immaterial to the ultimate outcome in this case. Thus, Amtrak's objections are moot.

### II.  Title VII Hostile Work Environment Claim (Count I)

Amtrak moves for summary judgment on the Title VII hostile work environment claim. In order to defeat a defendant's motion for summary judgment on a Title VII hostile work environment claim, a plaintiff must establish: (1) "that the work environment was both subjectively and objectively offensive," (2) "that the harassment was based on membership in a protected class," (3) "that the conduct was

severe or pervasive," and (4) "that there is a basis for employer liability." *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014)(internal quotations omitted)(quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014))(stating that "[t]he key inquiry is whether the conduct was so severe or pervasive that it altered the conditions of the employment relationship").

A.  Allegations Relating to African-American Co-workers

Amtrak correctly points out that in response to the instant motion Hood improperly attempts to support his hostile work environment claim by citing to alleged statements made by African-American co-workers.  Under this new theory in the case, Hood contends that Hispanic and African-American co-workers created a hostile work environment for Hood.  In addition, the statements allegedly made by African-American co-workers are different than those that Hood was previously asserting in regard to Hispanic Co-workers.  For example, Hood claims in his amended complaint that the Hispanic co-workers were calling Hood names such as "Gringo," whereas he now contends that African-American co-workers made statements to Hood, such as that "Irish people were slavers."  (A Comp. Par. 25); (Ans. SJ 4-5).  However, Hood's amended complaint makes clear that his hostile work environment claim is premised on alleged harassment by Hispanic co-workers, and their dissatisfaction because Hood was hired in place of a Hispanic individual. Hood asserts in his amended complaint that he "was constantly subjected to severe and pervasive harassment by his Hispanic co-workers, including Nunez and some or

all of the other Hispanic Mechanics." (A Compl. Par. 16). Hood also alleges that "the Hispanic employees, including Nunez, engaged in this harassment in order to affect adversely Plaintiff's job performance, and thereby cause the termination of Plaintiff's employment." (A Compl. Par. 17). Hood also alleges that "[s]everal of the Hispanic Mechanics . . . made recommendations to, and placed pressure upon, Amtrak management to hire the Hispanic Contractor," but that Hood was hired instead. (A Compl. Par. 13-14). Hood points to no references in his amended complaint to similar statements made by African-American co-workers.

The alleged statements by African-American co-workers that Hood now seeks to introduce were allegedly made directly to Hood. Hood thus should not have required any discovery to present a theory in this case that included alleged harassment by African-American co-workers. Hood contends that his charge with the Equal Employment Opportunity Commission (EEOC) only generally referenced harassment based on his race. (Ans. SJ 4 n.1). However, Hood's EEOC charge does not determine the scope of his claims in the instant action. In bringing the instant action, Hood specifically chose in his amended complaint to limit the scope of his claims to alleged harassment by Hispanic co-workers. The court also notes that Hood has already been allowed to amend his complaint once in this case and has still failed to include the new theory that he now seeks to introduce. Nor has Hood sought leave to amend his complaint to address the new theory in this case. Thus, it is improper for Hood to rely upon the alleged statements made by African-American co-workers in responding to Amtrak's motion for summary judgment. The court also

notes that even if such alleged statements by African-American co-workers were considered, Hood has failed to point to sufficient evidence to support his hostile work environment claim.

### B.  Severity of Alleged Harassment

Hood contends that the alleged harassment by Hispanic co-workers rose to the level of severity that would support a hostile work environment claim.  Hood claims that certain Hispanic co-workers made certain comments about his Caucasian race, for example, calling Hood a "gringo," "f___ing gringo," "cracker," "hillbilly," "white boy," "white devil," and "blue-eyed devil."  (SAF Par. 31, 37, 38, 40, 45). Hood also contends that Nunez told him on one occasion that he should not date Hispanic women, and threatened Hood that he would get Hood fired.  (SAF Par. 29, 33).

### 1.  Eavesdropping on Conversations

Hood acknowledged at his deposition that he merely indirectly overheard certain comments.  For example, Hood testified that he "overheard conversations" between Ed Rivera and Nunez discussing plans to get Hood fired during which Hood was referred to as a "gringo" and "blue-eyed devil."  (Hood dep. 23, 70-71).  Hood also alleges, for example, that Frank Diaz repeatedly referred to Hood as a "gringo." (Hood dep. 181-82, 194).  However, Hood also stated that he overheard such references to a "gringo" when Diaz was in a conversation with another party.  (Hood

dep. 194).  Although Hood claims to have personally heard such statements, he does

not contend that they were intended to be directed at him, which must be taken into

consideration in evaluating the severity of the alleged harassment.  *See, e.g. Moser v.*

*Indiana Dept. of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005)(stating that "second-

hand' harassment, although relevant, to be less objectionable than harassment

directed at the plaintiff").  Thus, certain alleged statements overheard by Hood are

not as significant as it relates to this action.


2.  Joking Manner of Statements

Hood acknowledged at his deposition that the statements referencing his race

were generally made in a joking manner.  (Hood dep. 132, 135-36).  Hood claims

that he did not joke back and found such joking to be offensive.  (Hood dep. 135).

However, even if Hood found such joking to be offensive and in poor taste, that

would not necessarily provide a basis for a hostile work environment claim.  *See*

*Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685 (7th Cir. 2010)(stating that the court

should consider "factors that include the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work

performance")(internal quotations omitted)(quoting *Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 23 (1993)); *see also e.g., Hawkins v. Groot Industries, Inc.*, 2003 WL

22078382, at *7 n.9 (N.D. Ill. 2003)(noting that the word in question "suggest[ed] it

was used in a joking context, not a hostile one").  The joking manner in which the

statements were allegedly made and the context in which they were made is a relevant consideration in assessing the severity of the alleged harassment.

### C.  Vandalism to Property

Hood also contends that vandalism occurred at the workplace causing damage to his car, boots, tools, and locker, and that a picture was placed on his locker. However, Hood has not pointed to evidence showing that such vandalism related to Hood's race.  Hood contends, for example, that the vandalism of his locker included a drawing and writing, but he has not shown that such depiction included a racist slur or otherwise suggested that such vandalism was racially motivated.  (SAF Par. 43). Hood also fails to point to sufficient evidence to tie such damage to alleged actions by Hispanic co-workers acting against Hood because of his race.  The undisputed facts, indicate that Hood was involved in confrontations and hostility with individuals from several races and national origins.  Hood contends that his African-American co-workers made hostile comments to him, that an Indian supervisor and Caucasian supervisors were out to get him, and that Caucasian co-workers were hostile toward him.  (SAF Par. 51-52, 79, 81, 92, 103, 104, 109-11, 119); (R SF Par. 34, 56).  Amtrak correctly points out that "[t]here is nothing to suggest. . . that the alleged vandalism was done by Hispanic employees as opposed to any of the other employees with whom Hood did not get along."  (Reply 3).  Even if any vandalism to Hood's property was anything other than typical vandalism, to assume that such

damage was caused by Hood's Hispanic co-workers due to a racial animus against Caucasians would be pure speculation.

### D.  Altercation with Nunez

Hood also contends that during the Nunez Altercation, Nunez grabbed Hood by the shirt.  However, Hood fails to point to sufficient evidence to tie such alleged actions to his race.  Also, Hood does not allege that he suffered any physical injury as a result of the Nunez Altercation.   Nor has Hood pointed to evidence to indicate that such incident was anything other than one isolated occurrence.

### E.  Lack of Objectively Reasonable Perceptions

Hood claims that he was subjected to "highly offensive harassment."  (Ans. SJ 1).  Although Hood claims to have subjectively felt as though he was suffering severe harassment at work, for his hostile work environment claim he must also show from an objective standard that he was subjected to a hostile work environment.  *See Turner*, 595 F.3d at 685 (stating that "a claim for a hostile work environment must be tested both objectively and subjectively" and that "the harassment must also be sufficiently severe or pervasive, from the standpoint of a reasonable person, to create a hostile work environment"); *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647 (7th Cir. 2011)(stating that "[i]n seeking to establish the existence of a hostile work environment, plaintiffs must show that their work

environment was both objectively and subjectively offensive—that is, 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so'")(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). It is apparent from the record that Hood's subjective belief as to the severity of alleged harassment was not an objectively reasonable belief. For example, Hood stated at his deposition that he believed that "calling a white boy a gringo" is "the same thing as calling a black guy a n____," the "same equal thing." (Hood dep. 147). The word "gringo" "is a term, mainly used in Spanish-speaking countries, to refer to an English-speaking foreigner, especially an American person." *See Gringo*, WIKIPEDIA, http://en.wikipedia.org/wiki/Gringo (last visited Oct. 22, 2014). On the other hand, the word referenced by Hood at his deposition relating to African-Americans is one of the most racially charged terms in the English language, and cannot in any way be reasonably compared as equal to the word "gringo." Thus, a reasonable person would not find the word "gringo" to constitute as severe harassment as Hood believed.

Hood also contends that he was called a "hillbilly," which Hood believes was a reference to his Caucasian race. The word "hillbilly" is "a term (often derogatory) for people who dwell in rural, mountainous areas primarily in Appalachia, but also parts of the Ozarks in the United States" and "[d]ue to its strongly stereotypical connotations, the term can be offensive to those Americans of Appalachian heritage." *See Hillbilly*, WIKIPEDIA, http://en.wikipedia.org/wiki/Hillbilly (last visited Oct.

22, 2014); *see also e.g., Malozienc v. Pacific Rail Services*, 606 F. Supp.2d 837, 862-63 (N.D. Ill. 2009)(indicating that the use of the term "hillbillies" or "rednecks" would not be sufficiently offensive to support a hostile work environment claim); *Bishop v. Tyson Foods, Inc.*, 660 F. Supp.2d 1004, 1020 (W.D. Ark. 2009)(indicating that "[t]here is nothing inherently racial about" the word "redneck"); *Hout v. City of Mansfield*, 550 F. Supp.2d 701, 738 (N.D. Ohio 2008)(concluding that statements allegedly made to a Caucasian plaintiff that he was a "lying White devil," "White son of a bitch," "White mother f____," "dumb White monkey," and "stupid redneck hillbilly" did not rise to the level of severity required to create a hostile work environment); *Kelley v. Billington*, 370 F.Supp.2d 151, 158 (D.D.C. 2005)(indicating that a statement that the type of music the plaintiff listened to was "hillbilly" had "nothing at all to do with plaintiffs' race").

The word "hillbilly" references a subculture in the United States and does not necessarily target a race or national origin. Title VII only protects against harassment based upon the limited protected characteristics, and membership in such a subculture within the United States is not one of those protected characteristics. 42 U.S.C. § 2000e-2(a). Thus, Hood's perception as to the extent that he was being harassed because of his race is not objectively reasonable.

The comments that Hood believes were related to his race by Hispanic co-workers did not rise to the level of severity that would suffice to create a hostile work environment. The Seventh Circuit has made clear that "Title VII is not a code of

civility." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 556 (7th Cir. 2007). The mere fact that the alleged comments made by Hood's Hispanic co-workers might have been offensive is not adequate to support a hostile work environment claim.

Hood has not shown that he was subjected to comments relating to his race sufficient to interfere with his work performance.

Finally, even when considering all of the alleged harassment identified by Hood in his workplace in its totality, Hood has not pointed to evidence showing an objectively severe or pervasive harassment to support a hostile work environment claim. Therefore, Amtrak's motion for summary judgment on the hostile work environment claim is granted.

## III. Title VII Race Discrimination Claim (Count II)

Amtrak moves for summary judgment on the Title VII race discrimination claim. A plaintiff bringing a Title VII race discrimination claim seeking to defeat a defendant's motion for summary judgment can proceed under the direct or indirect method of proof. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

### A. Direct Method of Proof

Hood contends that he can proceed under the direct method of proof on his Title VII discrimination claim. Under the direct method of proof, a plaintiff must

point to direct or circumstantial evidence that "constructing a convincing mosaic of circumstantial evidence" and "allows a [factfinder] to infer intentional discrimination by the decisionmaker." *Whitfield v. International Truck and Engine Corp.*, 755 F.3d 438, 443 (7th Cir. 2014)(internal quotations omitted)(stating that "[f]or this mosaic to be convincing, it must directly point to a discriminatory reason for the employer's action and also be directly related to the employment decision"); *Coleman*, 667 F.3d at 863 (stating that "[l]ike a group of Mesopotamian scholars," the court should "work hard to see if a 'convincing mosaic' can be assembled that would point to the equivalent of the blatantly discriminatory statement"); *Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014)(stating that to proceed under the direct method of proof a plaintiff must show "that (1) []he engaged in a statutorily protected activity, (2) h[is] employer took a materially adverse action against h[im], and (3) there was a causal connection between the two").

Hood merely states in a conclusory manner that he can proceed under the direct method of proof and provides no argument to support his assertion that he can satisfy the standard for the direct method of proof. (Ans. SJ 23). Hood has failed to point to sufficient evidence to indicate that Amtrak took any actions against Hood because of an intent to discriminate against him on account of his race. The undisputed facts show that Amtrak terminated Hood for a legitimate non-discriminatory reason. Thus, Hood cannot proceed under the direct method of proof.

B.  Indirect Method of Proof

Hood argues that he can also proceed under the indirect method of proof for his Title VII discrimination claim.  Under the indirect method of proof, a plaintiff who is bringing a Title VII discrimination claim must first establish a *prima facie* case.  *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014).  If the plaintiff establishes a *prima facie* case, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action."  *Id.*  If the employer provides such a reason, "the burden shifts back to the plaintiff to present evidence that the employer's reason is pretext for unlawful discrimination."  *Id.*  Hood contends that he was discriminated against when he was passed over for a promotion and when his employment was terminated in March 2013.  The court notes that Amtrak argues that other allegations by Hood relating to issues such as job scrutiny, reprimands, and undesirable work assignments were not adverse employment actions in the Title VII context, and Hood has not asserted otherwise in his opposition to the instant motion.  (Ans. SJ 18).

1.  Second Termination

Hood contends that he was discriminated against when his employment was terminated in March 2013.  To establish a *prima facie* case, a plaintiff generally must establish: (1) that he "is a member of a protected class," (2) that he "was meeting his employer's legitimate job expectations," (3) that he "suffered an adverse employment

15

action, and (4) that his "employer treated at least one similarly situated employee not in the plaintiff's protected class more favorably." *Cung Hnin*, 751 F.3d at 504. In a reverse discrimination case, such as the instant action, the first element is modified to require the plaintiff to establish "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand . . . ." *Good v. University of Chicago Medical Center*, 673 F.3d 670, 678 (7th Cir. 2012); *see also Phelan v. City of Chicago*, 347 F.3d 679, 685 (7th Cir. 2003)(explaining that "in order to gain the substantial benefits conferred by the use of the *McDonnell Douglas* test, . . . the non-minority plaintiff must be able to plead facts to show why it is likely in this case, that an employer had engaged in such unusual behavior").

Hood has failed to point to special background circumstances or facts that show that there is anything "fishy" about the facts in this case leading up to his termination. Although Hood contends that his Hispanic co-workers were out to get him and ensure that he was subjected to unwarranted discipline, the undisputed facts show that Hood was ultimately terminated for his involvement in the Zeimetz Altercation. Hood has been allowed to conduct discovery in this case and it is his burden, at this juncture, to present sufficient evidence to support his claims. *Diadenko v. Folino*, 741 F.3d 751, 757-58 (7th Cir. 2013)(stating that "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the

events")(internal quotations omitted)(quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)).  Hood's conclusory allegations in his amended complaint, as to a hidden animus against him that led to his termination, is not supported by evidence and is mere speculation on the part of Hood.  Such speculation is not sufficient to defeat Amtrak's motion for summary judgment.  The court also notes that even if Hood was not required in this reverse discrimination case to show something "fishy" about the facts, Hood still has not pointed to sufficient evidence to defeat Amtrak's motion for summary judgment.

Hood has not pointed to a similarly-situated employee outside the protected class who was treated more favorably than Hood.  An employee is deemed a "similarly situated employee" if that employee is "directly comparable to the plaintiff in all material respects, which is a common-sense, flexible analysis of relevant factors."  *Cung Hnin*, 751 F.3d at 504.  The only co-worker that Hood points to is Nunez.  (Ans. SJ 19).  Hood contends that during the Nunez Altercation, Nunez grabbed Hood by the shirt and that Nunez's employment was not terminated.  However, the undisputed facts show that Hood and Nunez were not similarly situated.  It is undisputed, that Nunez agreed to enroll in a drug treatment program and that Amtrak had a policy of giving a second chance to employees who agreed to seek such treatment.  (R SF Par. 83).  Hood claims that Nunez had been given such a second chance on an earlier occasion, but Hood has not pointed to sufficient evidence to show that the member of management who made the second chance

determination after the Nunez Altercation recalled extending the treatment option to Nunez on any prior occasion. (R SAF Par. 71). After the Zeimetz Altercation, Hood had been involved in two physical altercations in the workplace, the last resulting in criminal charges against Hood and Hood's arrest. Hood has not shown that Nunez had a similar history. In addition, it is undisputed the investigation of the Nunez Altercation and the Zeimetz Altercation involved different charging officers. (R SF Par. 76, 94). Hood has not shown that Nunez is similarly situated with Hood. Hood has thus failed to establish a *prima facie* case for his race discrimination claim based on his Section Termination.

### 2. Failure to Promote *Prima Facie* Case

Hood also contends that he was discriminated against when he was not promoted. To establish a *prima facie* case for such a claim, the plaintiff must establish: (1) that he was a "member[] of a protected class," (2) that he was "qualified for the position sought," (3) that he was "rejected for the position," and (4) that "the employer promoted someone outside the protected group who was not better qualified than the" plaintiff. *Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 439 (7th Cir. 2014).

In the instant action, Hood contends that he was denied a promotion to open General Foreman positions. Hood contends that he talked to certain supervisors expressing an interest in the positions, but Hood admits that he never submitted a

written application for such positions.  Hood has pointed to no evidence that shows that such oral expressions of interest qualified as a formal application for a job position at Amtrak.  Hood has not shown that he was rejected for the General Foreman positions, since it is undisputed that Hood never actually applied for the positions.  Thus, Hood has failed to establish a *prima facie* case for his Title VII failure-to-promote claim.


### 3.  Additional Adverse Actions

Hood also references other alleged actions taken against him such as alleged discriminatory discipline, unjust assignment of work, and his First Termination.  However, Hood has not shown that such actions were sufficient to constitute adverse employment actions.  The court also notes that in response to the instant motion, Hood has abandoned his position as to such additional alleged adverse action and has argued only that his Second Termination constituted an adverse employment action.  (Ans. SJ 18 n.4).


### 4.  Pretext

Amtrak contends that Hood has not pointed to sufficient evidence to show that Amtrak's given reasons for not-promoting Hood and terminating his employment were a pretext for unlawful discrimination.  In assessing whether the employer's given reason is a pretext the court must focus on "whether the proffered reason is a

lie" and "evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." *Cung Hnin*, 751 F.3d at 504 (internal quotations omitted)(quoting *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002-03 (7th Cir. 2013) and *Hill v. Tangherlini,* 724 F.3d 965, 968 (7th Cir. 2013)).

The undisputed facts indicate that Hood's employment was terminated because of his altercation with a Caucasian co-worker. To the extent that Hood seeks to argue his version of the altercation and question whether Amtrak should have believed his version instead of that of the other employee involved in the altercation, that is not a proper part of the pretext inquiry. *See Cung Hnin*, 751 F.3d at 504 (stating that the court's focus should not be on determining "whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge")(internal quotations omitted)(quoting *Coleman*, 667 F.3d at 852). Hood contends that Amtrak lied when giving its reason for firing him, to conceal the unlawful discriminatory intent to discriminate against Hood because of his race. However, the undisputed facts tell another story, which involves Hood and members of his same race.

For example, it is undisputed that one of the General Foreman positions that Hood contends was withheld from him based on his race was filled by a Caucasian employee. (R SF Par. 58). It is also undisputed that the five-day suspension held in abeyance as a result of the Nunez Altercation was disciplinary action handled by Caucasian members of management at Amtrak. (R SF Par. 58, 69-70). Hood also

fails to point to evidence to back up his claim of a conspiracy of racial discrimination by "Hispanic supervisors and co-workers" or the "conspiracy" that Hood claims was "orchestrat[ed] by Nunez." (Ans. SJ 1); (Hood dep. 107). It is undisputed that Nunez "never had any supervisory authority over Hood." (R SF Par. 3). It is undisputed that Hood believed that the members of management who handled the discipline for Hood, and who treated Nunez more favorably and held an animus against Caucasians, were Caucasian members of management. (R SF Par. 70, 80, 94, 101); (Ans. SJ 21). It is also undisputed: (1) that Hood's employment was terminated in 2010 during his probationary period, based on a decision by a Caucasian Superintendent, (2) that in 2013 Hood got in a physical altercation at work with Zeimetz, a Caucasian co-worker, (3) that Zeimetz brought charges against Hood resulting in Hood's arrest, (4) that disciplinary charges were brought against Hood by a Caucasian Foreman, (5) that a neutral Caucasian hearing officer was brought in to conduct Hood's disciplinary hearing, (6) that such Caucasian hearing officer found Hood guilty of the charges, and (7) that a separate Caucasian member of management at Amtrak made the ultimate decision to terminate Hood's employment. (R SF Par. 23, 56, 58, 84, 94-97, 100-01); (Ans. SJ 2, 16-17). Such facts in no way suggest any conspiracy against Hood by Hispanic supervisors and co-workers orchestrated by Nunez because of an animus against Caucasians.

Hood also acknowledged at his deposition that he worked with other Caucasian co-workers, but that for some reason they were not subjected to the

statements that Hood considered to be harassing. (Hood dep. 112). Such evidence suggests that any hostility faced by Hood at the workplace, if it existed at all, was based on a personality conflict. If there was truly an animus against Hood because he was Caucasian, then it would be logical that other Caucasian employees would face harassment as well. The Seventh Circuit has made clear that "Title VII protects against discrimination, not 'personal animosity or juvenile behavior.'" *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012)(quoting *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 666 (7th Cir. 2005)).

In response to the motion for summary judgment, Hood also questions the wisdom of Amtrak's policy of giving employees a second chance if they seek treatment. Hood contends that it is "preposterous" that Hood would receive less favorable treatment because he did not fall within the second chance policy that Amtrak had decided to extend to employees suffering from substance abuse problems. (Ans. SJ 21). However, whether or not Amtrak's policies are wise or make good general business sense is not a proper issue for the pretext inquiry. *See Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946-47 (7th Cir. 2006)(stating that "it is not [the Court's] role to question the wisdom of a company's decisions on how to run its business, only to assure that such decisions are not intended to provide cover for illegal discrimination"). Hood has thus failed to meet his burden to show that Amtrak's given reason was a pretext. Based on the above, Amtrak's motion for summary judgment on the Title VII discrimination claim is granted.

<u>IV.  Title VII Retaliation Claim (Count III)</u>

Amtrak moves for summary judgment on the Title VII race retaliation claim. A plaintiff bringing a Title VII retaliation claim seeking to defeat a defendant's motion for summary judgment can proceed under the direct or indirect method of proof.  *Moultrie v. Penn Aluminum Intern., LLC*, 766 F.3d 747, 754-55 (7th Cir. 2014).


<u>A.  Direct Method of Proof</u>

Hood argues that he can proceed under the direct method of proof for his Title VII retaliation claim.  A plaintiff who is bringing a Title VII retaliation claims can defeat a defendant's motion for summary judgment under the direct method of proof by pointing to direct evidence of discrimination or to a "convincing mosaic of circumstantial evidence. . . ."  *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 641-42 (7th Cir. 2013)(quoting *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)).  Hood points to certain statements allegedly made by supervisors at Amtrak such as that Hood was "slick,"and that they "had a new way of dealing" with people like Hood, and that they had "to be better at the game than" Hood.  However, Hood has not presented sufficient evidence for a reasonable trier of fact to infer a retaliatory motive based on such statements.  (Ans. SJ 26); (SAF Par. 92, 104). Hood also contends that Amtrak encouraged Zeimetz to file criminal charges against

Hood, but Hood has failed to point to evidence to indicate that such encouragement, if it occurred, was due to some retaliatory animus. Hood has not pointed to sufficient direct or circumstantial evidence to proceed under the direct method of proof on his Title VII retaliation claim.

## B. Indirect Method of Proof

Hood argues that he can also proceed under the indirect method of proof on his Title VII retaliation claim. Under the indirect method of proof, a plaintiff who is bringing a Title VII retaliation claim must first establish a *prima facie* case. *Hobgood*, 731 F.3d at 641-42. A plaintiff can establish a *prima facie* case by showing: (1) that the "plaintiff engaged in activity protected by law," (2) that "he met his employer's legitimate expectations, *i.e.*, he was performing his job satisfactorily," (3) that "he suffered a materially adverse action," and (4) that "he was treated less favorably than a similarly situated employee who did not engage in the activity protected by law." *Id.*; *see also Whittaker v. Northern Illinois University*, 424 F.3d 640, 648 (7th Cir. 2005)(explaining that the definition of an adverse action is broader in the retaliation context than in the discrimination context). If the plaintiff establishes a *prima facie* case, the burden shifts back to the employer to present a legitimate, non-discriminatory reason for the adverse employment action. *Hobgood*, 731 F.3d at 641-42. If the employer provides such a reason, the burden then shifts back to the plaintiff to show that the employer's reason is pretext. *Id.*

As explained above, the undisputed facts show that Hood was not meeting his employer's legitimate expectations. Nor has Hood pointed to a similarly situated employee outside the protected class who was treated more favorably. Hood points to Nunez, but as explained above, Hood has not shown that Nunez was similarly situated. Thus, Hood has failed to establish a *prima facie* case. Hood has also failed to point to evidence to show that Amtrak's reason for Hood's termination was a pretext. The undisputed facts clearly show that Hood's own action in getting in the physical altercation with a Caucasian co-worker was the reason for his termination. Management at Amtrak received a complaint about Hood alleging the initiation of physical contact with Zeimetz's person. Zeimetz brought charges against Hood and Hood was arrested. After an evidentiary hearing before a hearing officer, who was not part of the supposed conspiracy, Hood was found guilty of the charges. That was the second time in a few years that Hood had been disciplined relating to an altercation with a co-worker. There is nothing suspicious in the timing or circumstances surrounding the decision to terminate Hood's employment. Nor has Hood pointed to sufficient evidence to show that any of the other adverse actions relating to matters such as job assignments were connected to retaliation. Hood has failed to point to sufficient evidence to show that the reasons given for any of the adverse actions taken against Hood were a pretext for unlawful retaliation. Therefore, Amtrak's motion for summary judgment on the Title VII retaliation claim is granted.

<u>V. Section 1981 Claims</u>

Amtrak moves for summary judgment on the Section 1981 claims brought against Amtrak. Hood acknowledges in response to the instant motion that his Section 1981 claims brought against Amtrak are based on the same facts as his Title VII claims and that the Section 1981 claims should be resolved under the same standards. (Ans. SJ 12); *see also Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647 (7th Cir. 2011)(applying same standard for Title VII and Section 1981 hostile work environment claim); *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012)(stating that "[t]he substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981"); *Patton v. Indianapolis Public School Bd.*, 276 F.3d 334, 338 (7th Cir. 2002)(stating that "[d]iscrimination claims under both Title VII and § 1981 are analyzed in the same manner"). For the reasons explained above in regard to the Title VII claims, Amtrak's motion for summary judgment on the Section 1981 claims brought against Amtrak is granted.

In addition, to the extent that Hood seeks to bring Section 1981 claims individually against Nunez, there is no indication in the record that the facts which would apply to such claims would be different than those applied to the Section 1981 claims brought against Amtrak, or that there is additional evidence relating solely to Nunez's individual liability under Section 1981 that has not been presented to the court. *See Smith*, 681 F.3d at 899 (stating that "an individual can be liable under §

1981 for retaliatory conduct that would expose her employer to liability under Title VII or § 1981" and that "[t]he cat's paw theory can support individual liability under § 1981 for a subordinate employee who intentionally causes a decision-maker to take adverse action against another employee in retaliation for statutorily protected activity"). The court considered, in regard to the Title VII hostile work environment claims, the alleged statements that were made by Nunez. It is undisputed that Nunez had no supervisory authority over Hood. (R SF Par. 3). The undisputed facts also show that adverse actions were taken against Hood by management, and not by Nunez or input by Nunez, because of Hood's conduct. *See Harris v. Illinois*, 2014 WL 2766737, at *16 (N.D. Ill. 2014)(stating that "[i]n order for an individual to be personally liable under Section 1981 or Section 1983, he or she must have been involved in the alleged constitutional violation"). No reasonable trier of fact, could conclude that Nunez discriminated against Hood because of his race in violation of Section 1981. Therefore, the court dismisses the Section 1981 claims brought against Nunez.

VI.  Remaining State Law Claims

Having resolved the federal claims in this case, the court must determine whether to continue to exercise supplemental jurisdiction over the remaining state law claims. Once the federal claims in an action no longer remain, a federal court has discretion to decline to exercise supplemental jurisdiction over any remaining

state law claims.  *See Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251-52 (7th Cir. 1994)(stating that "the general rule is that, when all federal-law claims are dismissed before trial," the pendent claims should be left to the state courts).  The Seventh Circuit has indicated that there is no "'presumption' in favor of relinquishing supplemental jurisdiction. . . ." *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 906-07 (7th Cir. 2007).  The Seventh Circuit has stated that, In exercising its discretion, the court should consider a number of factors, including "the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources. . . ." *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994).  The court has considered all of the pertinent factors and, as a matter of discretion, the court declines to exercise supplemental jurisdiction over the remaining state law claims.  Such claims are therefore dismissed without prejudice.

## CONCLUSION

Based on the foregoing analysis, Amtrak's motion for summary judgment on the Title VII and the Section 1981 claims brought against Amtrak is granted, and the Section 1981 claims brought against Nunez are dismissed.  The remaining state law claims are dismissed without prejudice.

Samuel Der-Yeghiayan
United States District Court Judge


Dated:   October 28, 2014